**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LUVONDA GOAD and GREGORY A. GOAD, wife and husband,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>THE BUSCHMAN COMPANY, an Ohio corporation a/k/a FKI Logistex Automation, Inc.; and FKI LOGISTEX AUTOMATION, INC., an Ohio corporation.<br><br>　　　　　Defendants. | Case No. 06-CV-341-GKF-FHM |

## OPINION AND ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by Defendants, The Buschman Company and FKI Logistex Automation, Inc. [Document No. 26].

### I. STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When applying this standard, a court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Insurance Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995). The movant for summary judgment must meet the initial burden of showing the absence of a genuine issue of material fact, then the nonmovant bears the burden of pointing to specific facts in the record "showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Id.*

## II. BACKGROUND

On November 14, 2000, Plaintiff LuVonda Goad ("Goad") was working at the Albertsons Ponca City Distribution Center ("Distribution Center") as a stocker. During the course of performing her job duties, Goad's left hand and arm were pulled into an exposed pinch point in the conveyor system. Goad was unable to pull free from the conveyor, and after approximately 20 to 30 minutes, maintenance personnel were able to cut the belt and release her arm. As a result of this incident, Goad claims to have sustained severe physical injuries requiring past and continued medical treatment, physical disability, significant medical expenses, lost wages and earning capacity, physical pain and suffering, and emotional distress.

Goad filed this action against Defendants FKI Logistex Automation, Inc. and its predecessor Buschman Company (collectively "Buschman"), asserting claims for strict liability, negligence and gross negligence.[1] Buschman manufactured, designed and installed the conveyor system. Plaintiff Gregory Goad is LuVonda Goad's husband and has brought a claim for loss of consortium.

## III. MOTION FOR SUMMARY JUDGMENT

Buschman contends that Plaintiffs' claims are barred as a matter of law pursuant to Oklahoma's statute of repose, Okla. Stat. tit. 12, § 109, which provides as follows:

> No action in tort to recover damages
> (i) for any deficiency in the design, planning, supervision or observation of construction or construction of an improvement to real property,
> (ii) for injury to property, real or personal, arising out of any such deficiency, or
> (iii) for injury to the person or for wrongful death arising out of any such deficiency, shall be brought against any person owning, leasing, or in possession of such an improvement or performing or furnishing the design, planning, supervision or observation of construction or construction of such an improvement more than ten (10) years after substantial completion of such an improvement.

---

[1] Goad originally asserted a claim for breach of warranty but dismissed this claim voluntarily.

12 O.S. § 109.

There is no dispute that Buschman designed, manufactured and installed the conveyor system in the Distribution Center, nor is there any dispute that the incident occurred more than 10 years after substantial completion of the conveyor system. The central dispute is whether, as a matter of law, the conveyor system is considered "an improvement to real property" within the meaning of Oklahoma's statute of repose.

### A. The Conveyor System and the Distribution Center

Buschman entered into a "Sales Agreement" with American Stores Properties ("ASP") in the fall of 1985 for the design, construction and installation of a conveyor system in ASP's Distribution Center located in Ponca City, Oklahoma.[2] The Sales Agreement states that "all the equipment, machinery, parts and other items [are] intended to be installed permanently at the Worksite. . . ." ASP provided Buschman with its conveyor needs, including what it wanted the conveyor system to handle, the required rates and the general arrangement of the facility, and Buschman used this information to design a conveyor system for ASP. The purpose of the conveyor system was and still is to transport materials from one area of the Distribution Center to another. The conveyor system is important for the efficient operation of the Distribution Center.

Installation of the conveyor system took approximately 11 weeks utilizing a crew of 11 to 12 men. Buschman employees were responsible for on-site installation, start-up and testing of the system. The conveyor system is three stories high and, at the time it was installed, had approximately 6,155 feet of conveyor. The conveyor system consists of several conveyor

---

[2] As discussed below, ASP later sold the building with its conveyor system to Albertsons.

"standards" that were shipped to the Distribution Center and then erected to fit within the building's existing footprint.

The conveyor system is anchored to the floor of the Distribution Center by drilling and then inserting anchors into the concrete. The conveyor system is further affixed to the building by bolts, angle bracing, stabilizing legs, floor support columns and ceiling hangers. Additionally, the conveyor system is hard-wired into the facility. It is necessary that the conveyor system be affixed to the building in order for it to function properly and for safety purposes. The conveyor system is not welded to the structure or imbedded into the foundation, and it is possible to remove it from the building.

ASP began operating the conveyor system in January of 1986. Thereafter, ASP sold the Distribution Center, including the conveyor system, to Albertsons. The conveyor system is taxed as business personal property to Albertsons.[3]

On November 14, 2000, Goad was working as a stocker for Albertsons at the Distribution Center when she sustained injuries because her left hand and arm were pulled into the conveyor system. At the time of the incident, the conveyor system had been in the Distribution Center since the time of its installation in 1985. However, parts or sections of the conveyor system had been replaced or removed by Alberstons. The section of the conveyor system at issue here had not been replaced or removed since its installation.

---

[3] Plaintiffs dispute "in part" that the conveyor system taxes are paid by Alberstons, the owner of the distribution center, because the evidence presented purportedly lists more than one entity as the owner or taxpayer. (Plaintiffs' Response [Document No. 30], p. 6). Plaintiffs, however, do not dispute that "ASP sold the Distribution Center, including the conveyor system to Alberstons." (*Id.*, p. 3, ¶ 4 (admitting ¶ 4 of Defendants' Statement of Facts [Document No. 27])). The Court has reviewed the tax records presented by Defendants and finds that the evidence, in conjunction with Plaintiffs' own statements and admissions, sufficiently establishes that the taxes are paid by Albertsons, the owner of the Distribution Center.

Before ASP bought the building, which is now utilized as Albertsons' Distribution Center, it was operated by Huffy as a bicycle manufacturing plant. Huffy had installed a bicycle manufacturing line throughout the facility, most which was bolted to the structure of the building. When Huffy left, the entire manufacturing line was removed from the facility.

## B. Discussion

The issue before the Court is whether the conveyor system constitutes "an improvement to real property" within the meaning of Oklahoma's statute of repose, 12 O.S. § 109.

Plaintiffs argue that the conveyor system cannot constitute an improvement to real property because the conveyor system is classified as personal property for ad valorem tax purposes. Buschman contends that ad valorem tax treatment is not dispositive and that the court must consider a "common sense interpretation" of the phrase "improvement to real property," including (i) the permanence of the improvement; (ii) the degree to which the improvement enhances the value of the realty, and (iii) the intention of the parties to make the improvement on to the realty. Buschman also argues that the court should apply a "common law fixture analysis," considering whether the conveyor system is a fixture under Oklahoma statutory law.

Buschman asserts, and Plaintiffs do not dispute, that if the conveyor system is considered "an improvement to real property" under Section 109, then the statute of repose bars Plaintiffs' claims, including Mr. Goad's derivative claim for loss of consortium. Buschman was not responsible for on-going maintenance or safety consulting concerning the conveyor system. Buschman was responsible only for the design, construction and installation of the system, and Plaintiffs' claims are based entirely upon such activity.

As recognized by other courts and the Tenth Circuit Court of Appeals, Oklahoma law does

not clearly define what constitutes "an improvement to real property" within the meaning of Section 109. *See, e.g., Williams v. Harrop Indus., Inc.,* 73 P.3d 902, 904 (Okla. Civ. App. 2003); *O'Dell v. Lamb-Grays Harbor Co.*, 911 F.Supp. 490, 493 (W.D. Okla. 1995); *Durham v. Herbert Olbrich GMBH & Co.*, 404 F.3d 1249, 1252 (10th Cir. 2005). While the Oklahoma Supreme Court considered this issue in *Smith v. Westinghouse Elec. Corp.*, 732 P.2d 466 (Okla. 1987), its decision appears to have been based upon the unique circumstances of that case, and the precise issue presented here has not be squarely decided.

In *Smith*, the plaintiffs claimed to be injured after two electrical transformers exploded and released harmful toxins to which the plaintiffs were exposed. 732 P.2d at 468. The transformers were owned by Public Service Company of Oklahoma ("PSO") and were located in a vault beneath the sidewalk adjacent to the Beacon Building in downtown Tulsa, Oklahoma. *Id.* The trial court granted summary judgment in favor of defendants Westinghouse (the entity that sold the transformers to PSO) and Monsanto (the entity that produced the chemical inside the transformers), finding that Oklahoma's statute of repose barred the claims. *Id.* at 467. Plaintiffs appealed, arguing that the transformers did not constitute "improvements to real property" under the meaning of Section 109, and as a result, the statute did not apply. *Id.* The Supreme Court of Oklahoma agreed and reversed the entry of summary judgment. *Id.* at 467-68.

The Oklahoma Supreme Court held that "because an electrical transformer retains at all times its character as the personalty of the public utility supplying the electrical power, it is not an 'improvement to real property' within the meaning and contemplation of § 109." *Id.* at 467. The court premised its conclusion on the fact that, by statute, electrical transformers are taxed as the exclusive property of the public utility. *Id.* Since Oklahoma tax law clearly provides that such

property belongs to a public utility, it could not be considered an improvement to real property owned by an entity other than the utility.

The Oklahoma Supreme Court rejected two cases from other jurisdictions (*Jones v. Ohio Building Co.*, 447 N.E.2d 776 (Ohio Com. Pl. 1982) and *Mullis v. Southern Co. Serv., Inc*., 296 S.E.2d 579 (Ga. 1982)), which were relied upon by the defendants, as inapposite. *Smith*, 732 P.2d at 468-69.

In *Jones*, an Ohio trial court held that the construction and installation of an elevator was an improvement to real property. The defendant there (the manufacturer and installer of the elevator) was therefore protected by an Ohio statute of repose similar to Oklahoma's statute. The Oklahoma Supreme Court found *Jones* of no consequence in deciding whether a transformer constitutes a real property improvement because elevators are vastly different. *Id.* at 469. Elevators "serve an entirely dissimilar function and may be regarded as affixed to the interior of the building." *Id.* Also, the elevator in *Jones* was owned by the proprietor of the building. In *Smith*, the transformers were located in an underground vault adjacent to the building and had been neither purchased nor owned by the Beacon Building. They remained the property of PSO. *Id.*

In *Jones,* the Ohio court noted that the terms "fixture" and "improvement to real property" are not synonymous. A fixture, by definition, is an improvement to real property, but an improvement to real property need not be a fixture. *Jones*, 447 N.E.2d at 778. In *Smith*, the Oklahoma Supreme Court expressly left unsettled the question "whether a § 109 'improvement to real property' must always meet [Oklahoma's] statutory definition of real property." *Id.*, n. 12.[4]

---

[4] 60 O.S. § 5 defines real property as: 1. land; 2. that which is affixed to land; 3. that which is incidental or appurtenant to land; and 4. that which is immovable by law. 60 O.S. § 6 provides that "a thing is deemed to be affixed to land when it is. . . permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts or screws."

7

In *Mullis*, the Georgia Supreme Court held that an air circuit breaker (an integral part of an electrical system) was an improvement to real property. The court concluded that the system enhanced the value of the real property where the electrical facility was located. The Oklahoma Supreme Court found *Mullis* to be factually distinct because in *Mullis* the harm occurred "while the plaintiff was *on the premises* where the electrical system was located and while he was in physical contact with the circuit breaker." *Smith*, 732 P.2d at 469 (emphasis in original).

The court in *Mullis* applied a three-prong test for assessing what constitutes an improvement to real property: (1) the permanence of the improvement; (2) the degree to which the improvement enhances the value of the realty; and (3) the intention of the parties to make the improvement one to the realty. The Oklahoma Supreme Court stated that "this may be a correct conceptual approach when the injury for which recovery is sought occurs on the public utility's property, [but] it is not persuasive where, as here, the harm is dealt by an instrumentality located on property *serviced* by the public utility." *Smith*, 732 P.2d at 469 (emphasis in original).

The Oklahoma Supreme Court concluded in *Smith* that "[i]n Oklahoma, the answer must be derived from our taxing scheme. Because ad valorem taxes for the electrical equipment in suit are assessed solely against the public utility using it, the transformers in question were not improvements to real property." *Id.* at 470.

The *Smith* decision has been subsequently construed on a number of occasions. In a case with facts similar to those presented here, *O'Dell v. Lamb-Grays Harbor Co.*, 911 F.Supp. 490 (W.D. Okla. 1995), the United States District Court for the Western District of Oklahoma concluded that "the determinative factor in *Smith* was not that the transformer was taxed as personal property, but that it was taxed as the personal property of someone other than the owner of the real property

8

where it was located." 911 F.Supp. at 493. Distinguishing the facts of *Smith*, the court in *O'Dell* applied the three-part "common sense" analysis of *Mullis*, *supra*, in assessing whether the slat conveyor in that case constitutes an improvement to real property. *Id.* The *O'Dell* court also applied a "common law fixture analysis," considering whether the conveyor met the Oklahoma statutory definition of a fixture under 60 O.S. § 7. *Id.* at 493-94.

Likewise, in *Durham v. Herbert Olbrich GMBH & Co.*, the Tenth Circuit Court of Appeals, in determining whether production line equipment constituted an improvement to real property under 12 O.S. § 109, applied both the ad valorem tax test of *Smith* and the "common sense" test of *Mullis*. 404 F.3d 1249, 1253 (10th Cir. 2005). The Court of Appeals noted that *Smith* discussed the three-prong test of *Mullis* and found that "although *Smith* did not adopt these factors or apply them to the facts before it, it did not foreclose their use." *Id.* at 1253. "In fact, *Smith* gives tacit approval to these factors" in circumstances where the injury occurs on the property of the owner of the purported improvement. *Id.*

### C. Application to This Case

This Court likewise finds that *Smith* should be interpreted within its factual boundaries. The electrical transformers in *Smith* were taxed as the exclusive property of PSO, the utility supplying the electrical power to the building, and had neither been purchased nor owned by the proprietor of the building where the injury occurred. 732 P.2d at 468-69. In contrast to *Smith*, the conveyor system is owned by Albertsons, the owner of the building where Goad's injury occurred, and was constructed within the building. Thus, although the conveyor system has been taxed as personal property, this fact is not dispositive here as it was in *Smith*, since Oklahoma tax law deems the conveyor to be the property of the building's owner, Albertsons.

9

This Court, consistent with *O'Dell* and *Durham*, will also apply the three-part "common sense" test of *Mullis* to the facts of this case. As previously noted, the factors are: (1) the permanence of the improvement; (2) the degree to which the improvement enhances the value of the realty; and (3) the intention of the parties to make the improvement one to the realty.

In evaluating the permanence of the improvement, it is undisputed that the conveyor system is anchored to the floor of the Distribution Center by drilling, then inserting anchors into the concrete, then bolting the system into the anchors. The conveyor system is further affixed to the building by angle bracing, stabilizing legs, floor support columns and ceiling hangers. In addition, the conveyor system is hard-wired into the facility. Although the system is not welded to the floor or imbedded into the foundation, the nature of the conveyor system is such that it was intended to be permanently attached to the building by its design. While Buschman utilized mostly "standard" conveyor materials, the conveyor system as a whole was designed for this particular Distribution Center and was configured to fit within the footprint of the building. Moreover, it is necessary that the conveyor system be affixed to the building in order for it to function properly.

The Court finds that the conveyor system here is easily distinguished from the vinyl flooring production line in *Durham*, which was designed to be "totally self-supporting" and was "essentially free standing." 404 F.3d at 1251, 1256. Indeed, the specifications regarding the *Durham* machinery mandated that "no equipment may be connected to the building structure." *Id.* at 1256. The Court of Appeals stated that "a reasonable supposition may be that Armstrong wanted a free-standing portable production line that it could take with it in the event it moved to a new facility." *Id.* As such, the equipment in *Durham* was bolted to the floors but was not attached to the walls or roof of the building. *Id.* at 1251. Here, the conveyor system was not only bolted to the floors, but was also

anchored into the concrete and affixed to the building by angle bracing, stabilizing legs, floor support columns and ceiling hangers.

Further, the conveyor system is three stories high and consists of approximately 6,000 feet of conveyor. Installation took approximately 11 weeks utilizing a crew of 11 to 12 men. Installation required the presence of Buschman employees, who were responsible for on-site installation, start-up and testing of the system. The special size and make-up of the conveyor system, along with the amount and type of labor required for its installation, signifies that Buschman was not simply supplying a standard mass-produced piece of equipment that "by chance became affixed to [Alberstons'] property," but was instead designing and constructing a system that would adequately fulfill the needs of this particular building. *See Ball v. Harnischfeger Corp.*, 877 P.2d 45, 49-50 (Okla. 1994) (citing *McCormick v. Columbus Conveyor Co.*, 564 A.2d 907 (Pa. 1989) (concluding that the manufacturer of a conveyor belt was protected by its statute of repose)). This is the type of activity that is intended to be protected under Oklahoma's statute of repose. *Id.*[5]

Accordingly, this Court concludes that the permanence factor weighs in favor of a finding that the conveyor system is an improvement to real property.

The Court next considers the second factor – the degree to which the conveyor system enhances the value of the realty. The purpose of the conveyor system is to transport materials from one area of the Distribution Center to the other. Alberstons' business benefits from the conveyor system by gaining efficiency in its operation the building-- this benefit is derived from the improvements that the conveyor system furnishes to the realty itself. Nothing in the record indicates

---

[5] *See also Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 645-46 (Colo. 1988) (manufacturer of conveyor connecting two buildings was protected under the statute of repose); *Adair v. Koppers*, 741 F.2d 111, 116 (6th Cir. 1984) (manufacturer of coal-handling conveyor was protected by the statute of repose).

that the conveyor system manufactures or assists in the manufacturing of products. The conveyor system simply transports materials throughout the building. In this regard, the conveyor is more akin to an elevator. *See O'Dell*, 911 F.Supp. at 493 (finding the conveyor in question similar to an elevator) (citing *Smith*, 732 P.2d at 469 (the Oklahoma Supreme Court distinguished cases dealing with elevators because they "stand in a vastly different position" than electrical transformers and "may be regarded as affixed to the interior of the building. . . .")).

This Court finds that for purposes of weighing the second factor, the conveyor system is again distinguishable from the production equipment in *Durham*. *Durham* involved a vinyl flooring production line that was necessary for the defendant's manufacturing of vinyl flooring. The plaintiff in *Durham* was injured while he was cleaning a hot oil drum that was part of the base coating component of the production line. The plaintiff's arm became caught in a linoleum web that was being pulled around the hot oil drum for curing, and he was pressed against the drum's 300-degree surface. The production line in *Durham* provided no benefit to the realty itself, but was unique to and benefitted only the vinyl flooring business conducted in the building.

Moreover, the conveyor system was designed and erected to fit within the footprint of the Distribution Center. While the conveyor system may be removed, it presumably could not be erected within another existing building without modification of its current design and construction. The fact that Albertsons purchased the building from ASP with the conveyor system included therein and subsequently used the system as part of the building further demonstrates that the conveyor system enhances the value of the realty.

The Court concludes that the second factor also weighs in favor of a finding that the conveyor system is an improvement to real property.

Finally, the Court considers whether the parties intended the conveyor system to be an improvement to the realty. When ASP purchased the conveyor system from Buschman, the Sales Agreement stated that "all the equipment, machinery, parts and other items [are] intended to be installed permanently at the Worksite. . . ." The parties' intent to make the conveyor an improvement to the realty is confirmed by ASP's subsequent conduct– it sold the Distribution Center with its conveyor system to Alberstons for the same or similar purpose. Nothing in the record refutes the language of the sales agreement that, at the time of its installation, the conveyor system was intended to "be installed permanently."

Considering all the *Mullis* factors together, this Court concludes that the conveyor system constitutes an "improvement to real property" within the meaning of 12 O.S. § 109.

The Court additionally concludes that under the "common law fixture" analysis, the conveyor system constitutes an improvement to real property. 60 O.S. § 6 provides that "a thing is deemed to be affixed to land when it is. . . permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts or screws." Because the conveyor system was attached to the realty by means of bolts and screws, among other things, it meets the "common law fixture" test applied by the court in *O'Dell*.

**WHEREFORE**, Defendants' Motion for Summary Judgment [Document No. 26] is hereby **granted**.

**IT IS SO ORDERED** this 31st day of March 2008.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma